Good morning, Your Honor. Good morning. My name is Stephen B. Stephens. With me at counsel table is Colonel Doyle, who is on the brief with me, and he's also the trial counsel in this matter as well. May it please the Court, as I was preparing for the oral argument today and I was reviewing the briefs, one point struck me as I looked at the defendant's supplemental brief, and that is that the defendant still does not appreciate exactly the depth of what it did and the ramifications of what it did, as relevant to both the discretionary function issue as well as the assumption of the risk issue. And this is the point I'm making here. The government not only failed to post the 15 mile per hour speed limit signs along the sand highway, but it also misled visitors into believing that there was no speed limit along the sand highway. It did this by something that it actually brags about. There was, the defendant, the government says that there was a sign in a brochure available to anyone who asked for it, that there's a 15 mile per hour speed limit within 50 feet of the campsites. The implication of that announcement is that at 51 feet and beyond, it's a free for all. But in fact, that's not true. According to the government's own mandate, there is a 15 mile per hour speed limit on the sand highway, and by telling visitors that the speed limit essentially ends at 50 feet, it was inviting the very risk that it was trying to protect against. Recall that in 1987, the management plan identified the high number of collisions and serious injuries and deaths in the recreational area, and on the sand highway in particular, at the very spot that Mr. Garcia was so severely injured. By telling visitors essentially that there is no speed limit in contradiction to its own management plan and a contradiction to its own directive, it has in essence increased the risk to people using the sand highway. Therefore, on the assumption of the risk issue, the government has in fact increased the risk to all users, to all participants, and on the discretionary function issue, twofold. One, there is no discretion to disregard a mandate to post the signs, and even if it wasn't a mandate, the government still cannot claim discretionary function when the issue is safety, because safety and warnings are not the types of decisions that Congress meant to insulate under the discretionary functions. I have a specific, what may be a very picky question, but the material that was published in the Federal Register in 1988 with respect to this area... The Supplemental Rule. The Supplemental Rule deals with specified locations or roads. Is any of those, the road on which this horrible accident, or whatever we can characterize it as, took place? That is, it lists State Highway 78, the Imperial Sand Dunes Gecko Road, access roads within the Gecko and Road Runner Recreation Sites, and the Grays Well Road. Is it one of those where this happened? Which one was it? Yes, Your Honor. The map that the government offered as part of its motion is not a very good map. Would you call it the access roads? Because it's not the Gecko. No. If you can imagine this, and I'll try to use gestures as clearly as possible, you have Gecko Road that runs along part of the recreational area. Right next to Gecko Road there is this sand highway immediately adjacent to it. The sand highway, along the sand highway, there are camping pads all along the way within, say, about 50 feet of Gecko Road itself. Okay, but they're on sand highway. And you have to cross sand highway to get to the sand dunes. Exactly, Your Honor. The sand dunes, if you can imagine, there's the Gecko Road, there's the sand highway, and about a mile east are the sand dunes. I guess what I'm confused about is that it looked to me like the original record of decision was broader, where it talked about all sand highways, and this supplemental rule seems narrower and may not, that's what I'm struggling with, cover the specific area where this took place. It does cover that specific area because the supplemental rule specifies an area, I believe it is, let me get the language down here, within 500 feet of Gecko Road. So in other words, you have Gecko Road, you've got 500 feet east of Gecko Road, and that 500 feet includes sand highway. And Mr. Garcia was injured about 300 feet east of Gecko Road, so he was literally smack in the middle of sand highway. So the supplemental rule establishes the 15 miles an hour, but...  But the establishment of the zone and the putting up of the signs are arguably two different things. That is, you know, I sometimes drive for a long, long time wondering what the speed limit is where I am because, you know, I know it changes from 25 to 35 somewhere, but I'm not sure if I've passed that spot or not. So even when there is a specified speed limit, the placement of signs to describe that, and I understand part of your argument is there is zero, so that has to be more than zero, but to some extent the placement at least is discretionary, is it not? Well, you actually anticipated, of course, what my response was going to be, and that is whether a mile per hour limit sign should be 100 feet apart or 200 feet apart. I'm sure that there are traffic engineering manuals about that, and candidly I don't know what the standard is, but I have no doubt that some traffic engineering manual tells us how far apart mile per hour signs ought to be. But it is certainly clear that zero signs are inappropriate, and we have actually two mandates here from the 1987 management plan. One is establish the 15 mile per hour speed limit, which it did by saying that's the speed limit, and second, place the mile per hour speed limit signs along sand highway. By any reasonable definition, as the term is commonly understood, along a highway means to do it along the highway, not on a kiosk and not in a brochure or in a website. The answer to this next question may be obvious as well, and the answer may be that my question is premature and irrelevant, but where is the causation? I mean, looking at this accident, it's almost impossible for me to imagine that the posting of a 15 mile an hour sign somewhere along that highway would have made the slightest bit of difference. Well, I think the answer is multifaceted, so if I can have some time to develop my answer. Number one, there's a presumption in the law that people will obey the law, especially if they're informed about it, and here they were not informed about it. Number two, these visitors were actually misled about it because of the presumption is that the brochures and the signs are going to be read, a reasonable person would say... I can be reckless at 70 or 80 miles an hour and nobody cares? Well, in essence, what they're saying is that the speed limit applies only at 50 feet, so I can go one feet and beyond, and that's simply not the rule. The third aspect of causation, Your Honor, and the government did not... I know that, it's probably not pertinent, but... Well, as it turns out, Mr. Doyle being a cautious trial counsel, he anticipated that that question might come up, and he added two expert declarations. They're at the excerpt of record at pages 344 and 354 in which traffic experts explain that if someone was going 15 miles per hour along the road at the point of the impact, that person would have had enough time to see and avoid... No, I'm not saying that if they had obeyed it, I guess my causation question was given the way that the unknown person drove like a maniac, the 15 mile an hour sign would have made no difference to them. I guess I'm trying to find causation between the crazy speeder and the absence of a sign. Your Honor, to quote a previous oral argument, that's a good question, but the record isn't really developed on that because it was not a basis, but I could say in general... I was wondering, I had the same question, and I was wondering what the role of any of... ...in the 1987 ramp that it also talks about not only posting signs, but it also says enforce the 15 mile per hour speed limit, and I just had a question about, I mean, if they were failing to enforce the 15 mile per hour speed limit, then maybe that would be a basis for causation, and part of enforcement is posting the sign. Well, yeah, I think posting the sign is enforcement, number one. Number two, I think, Your Honor, you raised a very interesting question, that the government was so lax in its obedience to this directive that not even the rangers knew about the 15 mile per hour speed limit on Sand Highway. It's in the record, and I don't have the site handy, but I could mail it or reference to the court if necessary. The rangers, when asked in deposition, what are the 15 mile per hour speed limit, where does it apply? They didn't know what it applied right in the middle of Sand Highway where Mr. Garcia was so horribly injured. So this lax enforcement system, the failure to obey their own directives, it wasn't just recent. This was enacted in 1987, reinforced in 1988, and by the year 2010, 2011, a generation has passed and not one speed limit sign. And I think the government is in an awkward position to say that it wouldn't have made a difference when they didn't even try to make a difference. Is the fact that these requirements were listed under level two and it seemed to depend on funding? I don't think it does, Your Honor, because... Here. I don't think it does for two reasons, Your Honor. One, there's a long line of cases from this circuit that say that funding alone is not a good excuse for failing to obey a safety mandate or a safety directive. And number two, the record shows, and it's mentioned in the briefs a couple times, that this would have cost $800 to post the speed limit signs. At some point in the 22 years between adoption of the speed limit and Mr. Garcia's collision, somewhere the government had $800 to post the signs. Your Honor, I see I have about two and a half minutes left. You may... I would like to reserve a little rebuttal. You certainly may.  Well, I was just also wondering the role of the fact that they listed date project complete 11-1-87, $800 on EC 501. Yes. What is the implication of that? That the speed limit signs should have been posted by November of 1987, and they never were. Thank you, Your Honor. Thank you. We'll hear from the government. Good morning, Your Honors. I am Julie Zatz, Assistant United States Attorney, and with me today are Tim Laskey and Matt Lane, also of my office, representing the United States in this matter. The United States certainly agrees that it does not have the discretion to ignore a mandate set forth in a policy regulation or statute, but there's been no such occurrence in this case. And the United States' choice of means as how to implement the broad policy objectives in this case of safely increasing opportunities for public recreation and access within the context of limited funding must be susceptible to policy analysis. But to the extent that you're relying on lack of funding, I didn't see any demonstration on the part of the government that the funding was inadequate to fulfill the requirement. I know you don't agree it's a requirement to post these signs. Well, Your Honor, respectfully, the funding, the lack of funding, is a factor which, if susceptible to policy analysis in light of the agency's mission and objectives, is what the law requires, not the actual consideration of whether or not there was funding. I'm not sure I understood your answer, but it seems to me, let's say an agency clearly states, it shall be our policy to build walls to protect people in a certain location and they'll be this high and we'll do them in the next six months if funding allows. And they're not done, and the government says, well, we had the out of funding, isn't it up to the government at that point to demonstrate that it didn't have the funding when the decision is clearly made to do something and it isn't done? Yes, Your Honor, but your hypothetical is not this case. You're focusing on the ramp, and I think we know what that means. Yes. And the ramp clearly states that it is suggestive, it is a proposal, it is a strategy to try to achieve certain actions. What this court needs to do is to focus on the supplemental regulations because that's where, if there is a requirement, the requirement lies. And in the supplemental regulation, and I would draw your close attention to this fact, the supplemental regulation is entirely silent on section 2-13, which is set forth at the excerpt 426. That is the ramp specification or language that indicates that signs are to be posted along the sand highway. The regulation focuses on section 2-11, which requires or necessitates the establishment of a 15 mile an hour speed limit, and that has happened in this case. I'm not sure why that matters because the discretionary function exception allows the government the opportunity to make policy where policy is appropriate and not to dictate from the outside what that is. But the ramp itself says management prescriptions. This is what we intend to do. This is our policy. And so why isn't that, regardless of the format, sufficient to show that the government has exercised its discretion already, and that its exercise is to not only establish the speed limit but also to post the signs. In other words, it's not imposing from the outside what the policy is, it's been, the government said what the policy is. So why isn't that enough? Well, I'm going to move on and accept your premise because we simply differ on the suggestive versus prescriptive nature of the ramp itself. But let's assume that the ramp sets forth a policy that the BLM needs to try to adhere to, and that has happened in this case. Nowhere in the ramp or the regulation is there a specification of what it means to post a sign. Plaintiffs seem to think it means you drive a speed limit sign into the ground, into the sand. Well, it does along the sand highways. And in areas of high visitor concentration, which would include, and the district court, to the extent that the record describes where things are in relation to one another, the district court has indicated that the plaintiffs were camped next to the ranger station, the ranger station was near the public bathrooms, and near the kiosk, and all of that was adjacent to the sand highway. But it's not the plaintiffs that matter, it's the crazy driver that matters. So did what the government put forth equate to posting a sign along the sand highway sufficient to alert a driver along the highway? Your Honor, it's undisputed that the plaintiff and his party came to this area to ride their vehicles. And the record at 869 through 871 establishes that the plaintiff's party, the individuals in it, saw the sign on the back of the permit, the map, the kiosk, and, well, that would suffice. They saw the sign that said 15 mile an hour speed limit within 500 feet, they all discussed it, and plaintiff himself at 165 through 70 indicated that he had, on the back of the permit, been advised of what we are discussing. I don't understand how that's responsive to the question whether a driver who wasn't the plaintiff or with him, the driver, was the problem. Indeed. But, Your Honor, unless there was a big sign, I don't know the driver's name, I don't know that we do, that was posted that said, attention, crazy speeding driver, you. That's my causation question, but these are two separate issues, it seems to me. I mean, I asked it because it occurs to me that there may be problems down the road if it goes that far establishing any causation, but now we're talking about immunity, which is different. That means you don't even get to the point of proving causation, and I'm having difficulty understanding why the policy decision wasn't already made and then not followed. No, I'm accepting for purposes of argument that it was made, and I'm urging the court to appreciate that it was followed. What was required here? The requirement was to establish that speed limit, make the public aware of it, in an area of high visitor concentration, and specifically at 135, the rules will be posted near or within the lands, sites, or facility affected in the sand dunes area. The court, the district court, has tried to paint some sort of a picture as to what that means by indicating the proximity of all the places that the signs were posted within the ISTRA to areas of high visitor concentration. Excuse me for a second, because it seems like there's a distinction between the rules and signs, like those would be two different things, that posting the rules isn't tantamount to posting signs. No, Your Honor, if I was unclear, the signs, the indications of the 15 mile an hour speed limit, that's what was posted, not just a copy of the regulation. That's what was posted. And Judge Graber, you're concerned that the crazy driver didn't apparently see these signs. Well, I would submit that it's not reasonable to assume that the BLM, with all of the people and all of the issues that it confronts, has to assure itself that every... No, no, I understand that we're talking about two different pieces of the case. I'm trying to get back onto the... Let me ask you a hypothetical question. Assuming the rangers knew what the speed limit was, and they saw this guy driving, could they have issued a ticket for speeding? They could have. Indeed, the plaintiff and his party saw this guy careening around twice, and never told the rangers, albeit there were only five of them to cover 149,000 acres, but yes, they could have. But the posting would have been adequate for a criminal procedure. Yes, I believe so. I believe it would have. Now, so Your Honor, with respect to the first prompt of Berkovitz, whether or not there was a mandate, we submit that the only requirement, if one exists, exists in the supplemental regulation which focuses, narrows, and defines much more clearly what the ramp only suggests. And it is susceptible, what we did was susceptible to policy analysis. The mission of the BLM in this case is no different than it was in Reed. The mission is recreation, environmental preservation, resource protection, safety, and increasing public access and enjoyment. And the posting, the placement of these signs in such an advising of the speed limit, in such a variety of locations, I mean, I don't know because I don't ride these vehicles, but putting them by the public bathrooms, I assume people who ride these vehicles still have to go to the bathroom and leave their campground to do it. The kiosk was right there. There were map dispensers where they could have seen this. There were off-site locations where they could purchase and did purchase permits, and it was on the back of the permit. But isn't that your argument that the plaintiffs were aware of it? Doesn't that, isn't that worse? If the plaintiffs were aware of it, they're relying on the fact that everybody's only supposed to go 15 miles an hour, so they feel that it's safe to cross the sand highway? They are aware of everyone's responsibility, and parenthetically, the plaintiff himself has admitted he wasn't observing the 15-mile-an-hour speed limit. He was slightly over. He was going 20. But my point is that it's fair to assume that one hopes that everyone will obey the law, and there is an unquestionable limit as to how many rangers are available to do this sort of enforcement. And as any law enforcement agency needs to incorporate the public, if they're the eyes and ears and they're aware of this, they could bring it to the attention of the agency as well. My point is, Your Honor, that implementation here was totally consistent with the policy objectives of increasing access, preserving safety. One can only imagine, since people ride these things around aimlessly at night, putting a sign somewhere along the highway, which is 40 miles long and 5 miles wide, that someone could careen into it and decapitate themselves. And when we talk about the sand highway, let's be clear. When I entered the courtroom or the building, I got onto the rug highway. This is the sand highway. It's nothing but a desert. And you, for purposes of my analogy, are the dunes. If I were to approach you, I would be doing so on the rug highway. We're all on the rug highway. So to say that there should have been signs here or here or here and that it would have made a difference and that it would have been better than all of the other places that these signs were, I think is unfair. It's not required. And I think in this case, you don't have a situation like you did in Young, where a hazard was created by the agency and it was latent. And even Young recognized, in that case the Park Service, had the discretion through its policies and mission to address access and public safety within a limited resource context. That is not something that is inappropriate. And nowhere has this court ever held that safety issues are per se non-discretionary. Where the government has gotten into trouble has been where they have adopted a clearly specified safety plan and then done nothing. That's what happened in Faber. To some degree, that's what happened in Oberon. That's not what happened here. That's not at all what happened here. Your Honors, if I may, there's an alternative basis upon which you can affirm the district court's decision. And that, of course, is the primary assumption of risk analysis. There's no question, but the plaintiff was recreating on his vehicle. I mean, to split the hair, as he has done, would be to say that, forgive me for a California analogy, if I were paddling out on my surfboard to catch a wave, then I got detained in the water by a shark, that I wasn't engaged at that point in an inherently risky activity of surfing because I hadn't turned around, caught the wave, and been standing up on the board. It's silly. Of course they were engaged in it. They were doing tricks, or he was doing tricks, I'm sorry, wheelies at the time. And again, it is important to note that the hazard here is a desert, not a man-made ramp on private land. Therefore, the court could easily find that the plaintiff had assumed the risk of his own injury and affirm the district court's opinion on that basis. Thank you, counsel. Mr. Stevens, you have a little rebuttal time remaining. Thank you, Your Honor. There's much raised. I'll try to cover it as succinctly as possible. I'll start with the last comment. Counsel has the wrong analogy. The analogy isn't the surfer in the water who encounters the shark. The analogy is the surfer who has to cross the sand before getting to the water and find some sort of hazard there that the owner of the beach knew about, had a mandate to protect against or to warn against, and decided not to do it for 20 years. Counsel has said, well, once you're on the dunes, now you're at risk. Here's the thing, though, Mr. Garcia was not on the dunes. He was heading towards the dunes, no doubt about it. The government defines the sand highway and its regulations, so it's a bit unusual to have him coming in here today saying, actually, there is no definition of the sand highway. Well, it's in the federal regulations. Also, I was a bit surprised that the government is relying so heavily on the sign and the brochure since they have the wrong speed limit. And in counsel's presentation, we didn't hear any explanation for how is it that it is okay to actively mislead visitors. But I didn't catch that in reading this case. What do you mean they have the wrong speed limit? This is what I was talking about earlier, Your Honor, that the speed limit is 15 miles per hour according to the sign and the brochure, 15 miles per hour within 50 feet of Gecko Road, when in fact the rule is it's supposed to be 15 miles per hour within 500 feet of Gecko Road. So the implication is that if you're where Mr. Garcia is, it's sort of a free for all when, in fact, it's not the rule at all. I'm a bit surprised that there's a discussion about the directive about this mandate here because the 1987 plan says number one, establish the 15 miles per hour speed limit, which is what we talked about earlier. And it says right there, the management plan says post 15 miles per hour signs along the sand highways. Now, counsel is suggesting that because it's in a management plan, therefore, it doesn't have the force of a rule. Yet, counsel invokes favor, which involved a management plan. And I would also note it's discussed in the briefs, Navarette. Navarette involved an Army, the Army Corps of Engineers had a safety plan. The discretionary function doctrine involves the questions whether there are rules, statutes, or policies that create the mandates. It doesn't have to be a statute. It doesn't have to be a rule. It has to be a policy. Thank you, counsel. Your time has expired. We appreciate the arguments of both parties in this very interesting case, and the case is submitted, and we stand adjourned for this session. Thank you, Your Honor.
judges: Molloy, Graber, Wardlaw